RAYMOND A. LYNCH, EUGENE R. MCNINCH, PAULINE POSTLES, WILLIAM E. PRETTYMAN, HAROLD A. TARRANT, EDITH R. KENDALL, CAROLINE KEENE, and CHARLES M. MOYER, Constituting the State Board of Health of the State of Delaware, Defendants Below,

Appellants,

*vs.*

JAMES M. TUNNELL, JR., MILDRED S. TUNNELL, ROBERT W. TUNNELL and EOLYNE K. TUNNELL, Plaintiffs Below,

Appellees.

*Supreme Court, On Appeal, October 30, 1967.*

*Reargument Denied, November 27, 1967.*

*Ruth M. Ferrell,* Deputy Atty. Gen., Wilmington, for defendants below, appellants.

*James M. Tunnell, Jr.,* of Morris, Nichols, Arsht & Tunnell, Wilmington, and *Robert W. Tunnell,* of Tunnell & Raysor, Georgetown, for plaintiffs below, appellees.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice: The defendants, constituting the State Board of Health (hereinafter the "Board"), appeal from a preliminary injunction barring the Board from requiring a permit for the operation of a mobile home park by the plaintiffs (hereinafter the "Owners"). The determinative question is whether the Board has the power to require such permit. We think not.

## I.

These facts are undisputed: The Owners have developed an area on Indian River Bay in Sussex County for the purpose of renting sites for mobile homes, catering primarily to those who would own and use such homes as semi-permanent vacation residences. In accordance with the general practice for similar projects in the area, the Owners' plans call for septic tank sewerage for each home, to be installed in this case by each lessee.

The type of mobile home, to be permitted in the project under the Owners' form of lease, has the following characteristics: The home must have at least 475 square feet of floor space in the main unit, not including additions such as porch, sun parlor, patio or storage room, located on a lot of not less than 5,000 square feet. Structures of this size are not licensable as vehicles or conveyances by the Motor Vehicle Department. Such mobile homes are usually moved on the highway by contract carriers and are required to have special "wide load" permits as in moving houses.[1] Such mobile homes are distinguishable from travel "trailers" which are licensed by the Motor Vehicle Department and which are towable by ordinary automobiles.

---

1. See Hodes and Roberson, *The Law of Mobile Homes* (2d Ed., 1964) pp. 1, 8; *Manley v. Draper,* 44 Misc.2d 613, 254 N.Y.S.2d 739, 741 (1944).

The Owners' proposed lease for the lots in the project will commit the Owners to a ten year term although each lessee will be permitted to terminate the lease at the end of any calendar year. Under the lease form, each lessee will be required to install a septic tank plus a rock aggregate and tile seepage field. In this connection, the Owners' lease form also provides:

> "Lessee shall provide his own sewage disposal facilities and take the responsibility for maintenance of the same, all as may be required from time to time by the Air and Water Resources Commission of Delaware, the State Board of Health or any other governmental authority having jurisdiction over such matters, and Lessee further agrees to abide by Lessors' directions with respect to the location of such sewage facilities. In the event that sewage should for any reason flow out upon the ground surface or begin to pollute a Lagoon or the water of the River or Bay, Lessee agrees to cease to occupy the mobile home on the premises until he has caused such condition to be corrected."

In this respect, the mobile homes to be situated in this project are also distinguishable from travel trailers in that the latter ordinarily require a hook-up to a sewerage disposal system owned by the court or camp where the trailer may be parked from time to time.

Each home site of the Owners' project is provided with connection for telephone, electricity, and water lines, in the same manner as ordinary houses. The proposed lease provides that the homes must be fitted with a "skirting" to conceal the foundations and that ornamental fencing may be installed.

At the early stages of the project, the Owners submitted their plans to Board of Health officials, who took the position that a central sewerage system for the entire project would be preferable to individual septic tanks. Thereafter, effective July 1, 1966, 16 *Del.C.* § 1506 was enacted:

> "§ 1506.  Plans for construction or alterations
>
> "All plans for the construction or alteration of sewerage or water supply system shall be submitted in duplicate to the Water and Air Resources Commission for its approval before construction shall be started upon same. The Water and Air Resources

> Commission shall promptly forward one copy of the plans to the State Board of Health for approval. The Water and Air Resources Commission shall not grant its approval of the plans if the State Board of Health disapproves the plans within 30 days, and cites its reason for disapproval."

Intending to comply with the above Statute, the Owners thereafter dealt with the Water and Air Resources Commission (hereinafter the "Commission") in connection with their plans for the project. Upon the Owners' application, the Commission approved the proposed water system and issued a permit therefor; but the Commission took the position that the Owners' application for approval of the proposed sewerage system was premature because the Owners themselves had no plans "for the construction or alteration" of a sewerage system in view of the fact that the septic tanks were to be installed by the Owners' tenants; that, therefore, a single sewerage permit to the Owners was inappropriate and the Owners needed no further permit as to the sewerage system for the project. The Commission also indicated that it was in the process of promulgating septic tank regulations under which each lessee would be required to apply for a permit as to his own sewerage installation.

All of this notwithstanding, the Board continued to assert authority over the project, informing the Owners that they must have an occupational or operational permit from the Board for the operation of the project before lots could be leased; and the Board refused to issue such permit on the ground that a central sewerage system was not provided by the plans. The Board rejected the Owners' contention that this requirement was discriminatory as to their project because no such requirement was being enforced by the Board elsewhere in the area.

The Owners brought this action against the Board to enjoin it from requiring them to obtain an occupational permit as a prerequisite to leasing lots. From the issuance of a preliminary injunction to that effect,[2] the Board appeals.

2. The reasons for the decision of the Court below do not appear on the record, although stated orally. Again, we note the essentiality of a statement on the record of the Court's reasons for a judgment. See *Walsh v. Hotel Corporation of America*, Del., 231 *A.2d* 458, 460, f. n. 1 (1967); *Ademski v. Ruth*, Del., 229 *A.2d* 837, 838, f. n. 1 (1967); *Mumford v. Robinson*, Del., 231 *A.2d* 477, 479, f. n. 1 (1967).

## II.

As the source of the power and authority it seeks to assert over the project, and as the basis for the occupational permit requirement it seeks to impose upon the Owners, the Board points to 16 *Del.C.* § 122(3)(H)[3] providing:

"§ 122.   General powers and duties of Board; regulations

"The State Board of Health shall have the following general powers and duties—

\*     \*     \*

"(3) By affirmative vote of a majority of the Board, to adopt, promulgate, amend, and repeal regulations consistent with law, which shall be enforced by all State and local public health officials, to:

\*     \*     \*

"(H) Provide for sanitary control of public eating places, tourist camps, trailer camps, other public camps, and service stations;

\*     \*     \*

"When deemed necessary by the Board, such regulations may provide for the issuance of permits to persons engaged in the occupations or businesses so regulated, and the revocation for cause of the permits."

Pursuant to that Statute, in 1953, the Board promulgated "Regulations Governing Trailer Camps or Courts."   The Regulations provide: "It shall be unlawful for any person to construct, maintain or operate any trailer court * * * unless he holds a permit for the specific trailer court."' The Regulations define a "trailer camp or court" as "any plot of ground rented, leased or loaned, or which is utilized with or without permission of the owner as a parking space for two or more trailer coaches, occupied for residential purposes." A "trailer coach" is defined by the Regulations as "any vehicle used or so constructed as to permit its being used as a conveyance upon the public

---

3. Other sub-sections of 16 *Del. C.* § 122(3) provide for Board of Health control of, and the issuance of occupational permits to, milk and food producers and distributors, operators of public bathing places, garbage collectors, and midwives, *inter alia.*

streets or highways, constructed in such a manner as will permit occupancy thereof as a dwelling and sleeping place for one or more persons." This is the nature and scope of the Regulations the Board seeks to enforce in this case.

■ It is our opinion that the Owners' project is not governed by 16 *Del.C.* § 122(3)(H) or by the Board's Regulations adopted thereunder. A mobile home, of the type permissible in the development, does not fall within the Board's definition of a trailer; it is not "so constructed as to permit its being used as a conveyance." And, in 1965, the General Assembly demonstrated its recognition of the basic distinction between trailers and mobile homes by imposing a real property tax on mobile homes. 14 *Del.C.* § 1930. Furthermore, a mobile home development, of the kind programed by the Owners, is neither a "camp" nor a "court" within the meaning of the Statute and the Regulations. Clearly, § 122(3)(H) was intended to govern places catering to tourists and transients; it covers "public eating places", "service stations", and tourist, trailer, and other "public camps." The transient character of each component of the listing is self-evident. The mobile home development here in question does not fit into any such transitory classification.

■■ The Board contends that, by its Regulations, it has encompassed something greater than a "trailer camp", *i. e.,* a "trailer court", and that the Owners' project is thereby included within its jurisdiction as a trailer court. We find this position untenable for two reasons: first, because the Board's Regulations can be no wider in coverage than the enabling Statute § 122(3)(H) which is limited to "camp"; and second, because it is evident on the face of the Regulations that, in 1953 when they were promulgated, mobile home sites of the type here involved were not contemplated by the Board. For example, the Regulations require that each court have a "service building" furnishing central toilet facilities for trailer occupants; that each trailer court owner or operator maintain a register, like a hotel or motel register, identifying each vehicle and its occupants; that each trailer court manager report immediately any case of communicable disease among the occupants. Such Regulations demonstrate the transient, hostelry nature of the camp or court contemplated by the drafters of the Statute and the Regulations. As we have seen, mobile home sites, such as those contemplated by the Owners, may not be placed in that category.

▮▮ The powers of the Board must be found within an enabling statute. This is especially so when we come to occupational or operational permits and licenses. The power to license a business or occupation will not be lightly implied; it touches upon economic freedom, one of our fundamental liberties. We do not find such licensing power for mobile home developments vested in the Board of Health by any statute, either expressly or by necessary implication. We conclude, therefore, that such power does not exist.

## III.

▮ The Board also argues that 16 *Del.C.* § 1506 authorizes it to require an occupational permit for this project. There is no merit in this contention: first, the Commission is the active agency under § 1506, not the Board; second § 1506 does not authorize an operational or occupational permit by any agency. The Statute requires the usual governmental approval of plans for sewerage and water systems before installation may be commenced; but such "building" permit is something quite different from the operational or occupational license requirement which the Board seeks to impose.

## IV.

The jurisdiction of the Chancery Court to grant injunctive relief in this case is questioned by the Board on the ground that certiorari or mandamus would afford the Board an adequate remedy at law. We are unable to agree.

▮ Assuming the propriety of certiorari for review of Board of Health decisions such as are here involved, certiorari would not be an adequate legal remedy in this case because the Owners were required to establish a set of facts for purposes of this review: the nature of the site project, the nature of mobile homes, and the nature of leaseholds under which the sites and the homes were to be used. The Owners would not have been able to enlarge the record, in a common law certiorari review of the Board's decisions, by the establishment of such facts. See 1 *Woolley on Delaware Practice,* Sec. 897. The statutory certiorari cases cited by the Board are inapposite.

▮ Mandamus is also inappropriate. The Owners are not seeking to oblige the Board to issue a permit; on the contrary, the Owners contend that the Board lacks the power to require or issue such permit.

For the reasons stated, we find no error in the judgment below. Accordingly, it is affirmed.

## UPON PETITION FOR REARGUMENT

The Board has petitioned for reargument on several grounds, only one of which merits further discussion:

██ It is asserted that we did not dispose of the contention, developed during oral argument, that the Board is authorized to require the Owners to obtain a permit under the Board's "Regulations Governing Private Water Supplies and/or Sewage Disposal Systems for Homes and Other Establishments in Areas Where Public Water Supplies and/or Sewerage Facilities Are Not Available" adopted in 1956, pursuant to 16 *Del.C.* § 122(3)(C) and (D).[1]

It is to be noted that these Regulations, like 16 *Del.C.* § 1506 discussed above, require the usual governmental approval of water and sewerage systems before construction and installation may commence. Thus, these Regulations require a "building" permit; they do not require the operational or occupational permit the Board seeks to impose in the instant case.

We need go no further into the applicability of the "Regulations Governing Private Water Supplies, etc." Obviously those Regulations were not relied upon by the Board in this case.

The Petition for Reargument is denied.

---

1. These sections give the Board the power to adopt regulations to:

"(C) Provide for the sanitary protection of all water supplies which are furnished to and used by the public;

"(D) Provide for the proper collection, storage, and disposal of sewage, household wastes, and garbage by public authorities and individuals."