# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DELAWAREANS FOR EDUCATIONAL
OPPORTUNITY and NAACP DELAWARE
STATE CONFERENCE OF BRANCHES,

     Plaintiffs,

     v.

JOHN CARNEY, Governor of the State of
Delaware; SUSAN BUNTING, Secretary of
Education of the State of Delaware; KENNETH
A. SIMPLER, Treasurer of the State of
Delaware; SUSAN DURHAM, Director of
Finance of Kent County, Delaware; BRIAN
MAXWELL, Chief Financial Officer of New
Castle County, Delaware; and GINA
JENNINGS, Finance Director for Sussex County,

     Defendants.

C.A. No. 2018-0029-VCL

## MEMORANDUM OPINION

Date Submitted: August 29, 2018
Date Decided: October 5, 2018

Ryan Tack-Hooper, Karen Lantz, ACLU FOUNDATION OF DELAWARE, INC.,
Wilmington, Delaware; Richard H. Morse, Brian S. Eng, COMMUNITY LEGAL AID
SOCIETY, INC; *Counsel for Plaintiffs.*

Barry M. Willoughby, Kathaleen St. J. McCormick, Lauren E.M. Russell, Elisabeth S.
Bradley, Lauren Dunkle Fortunato, YOUNG CONAWAY STARGATT & TAYLOR,
LLP, Wilmington, Delaware; *Counsel for Defendants John Carney, Susan Bunting, and
Kenneth A. Simpler.*

William W. Pepper Sr., Gary E. Junge, SCHMITTINGER & RODRIGUEZ, P.A., Dover,
Delaware; *Counsel for Defendant Susan Durham.*

Herbert W. Mondros, Helene Episcopo, MARGOLIS EDELSTEIN, Wilmington
Delaware; *Counsel for Defendant Gina Jennings.*

Adam Singer, Mary A. Jacobson, NEW CASTLE COUNTY OFFICE OF LAW, New Castle, Delaware; *Counsel for Defendant David M. Gregor.*

**LASTER, V.C.**

The plaintiffs contend that Delaware fails to provide children from low-income families, children with disabilities, and children whose first language is not English (collectively, "Disadvantaged Students") with a meaningful opportunity to obtain an adequate education. They assert that part of the problem is an inequitable system for funding public schools. They argue that New Castle County, Kent County, and Sussex County contribute to the problem by failing to collect school-related taxes in a manner that complies with the statutory scheme created by the Delaware General Assembly.

Delaware public schools receive funds from local, state, and federal sources. The local portion contributes approximately one third of the total. The amount of local taxes that a school district collects depends on two variables: the assessed value and the tax rate.

By statute, the assessed value must reflect the property's "true value in money." The Delaware Supreme Court has held that this concept equates to the property's "fair market value." This decision refers to this statutory obligation as the "Market Value Requirement."

As clear as this mandate sounds, assessments in Delaware remain at values established thirty to forty years ago. In Count III of their complaint, the plaintiffs assert a straightforward claim: Collecting taxes based on decades-old values violates the Market Value Requirement.

To obtain relief, the plaintiffs sued the officials responsible for collecting property taxes in New Castle, Kent, and Sussex Counties. No one accuses these individuals of engaging personally in any financial impropriety. The plaintiffs have sued them as representatives of their respective offices, which are the vehicles through which the counties collect property taxes. As their preferred form of relief, the plaintiffs seek an order

1

that would stop the officials from collecting taxes until the counties devise a way to comply with the Market Value Requirement.

The county officials have moved to dismiss the complaint. This decision denies their motion.

## I.     FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' complaint. At this stage of the proceedings, the plaintiffs' allegations are assumed to be true, and they receive the benefit of all reasonable inferences.

### A.     Public Schools And Property Taxes

Delaware public schools receive funding from federal, state, and local sources. In Fiscal Year 2016, 31% of their funding came from local sources.[1]

To generate local revenue, county officials levy taxes on owners of non-exempt real property located in the school district.[2] The amount of local revenue depends on two variables: the assessed value of the property and the tax rate per dollar of assessed value.

The Delaware Code provides that "[a]ll property subject to assessment shall be assessed at its true value in money."[3] The Delaware Supreme Court has held that the

---

[1] Compl. ¶ 27.

[2] *See* 14 *Del. C.* §§ 1902–03, 1913–18.

[3] 9 *Del. C.* § 8306(a).

2

concept of a property's "true value in money" is "the same as its fair market value."[4] Elaborating, the high court explained that "fair market value" is "the price which would be agreed upon by a willing seller and a willing buyer, under ordinary circumstances, neither party being under any compulsion to buy or sell."[5]

## B. Decades-Old Assessed Values

Even though the Delaware Code mandates that property by assessed at its "true value in money," and even though the Delaware Supreme Court has held that this standard means its "fair market value,"[6] property in Delaware remains assessed at values from thirty to forty years ago.

In New Castle County, assessments are based upon property values from 1983. In Kent County, assessments are based on property values from 1987. In Sussex County, assessments are based on property values from 1974. These are the magic years because they mark when each county's last general assessment became effective.

Property values have changed dramatically since the 1970s and 1980s. The plaintiffs observe that the statewide inflation-adjusted median sales price of a new home in January 1980 (measured in 2017 dollars) was $126,455. By January 2010, the median value of all owner-occupied housing in Delaware (not just new homes) was $273,000, a 116% real

---

[4] *New Castle Cty. Dep't of Fin. v. Teachers Ins. & Annuity Ass'n*, 669 A.2d 100, 102 (Del. 1995).

[5] *Id.*

[6] *Id.*

3

increase over the 1980 figure. They also observe that the House Price Index for New Castle County, published by the Federal Housing Finance Agency, increased 340% between 1983 and 2016. Yet the counties continue to use property values from 1987, 1983, and 1974.

One can reasonably infer that during the intervening decades, property values have changed at different rates in different parts of the state. Beach property in Sussex County has appreciated differently than property further inland. Urban property in Wilmington or Dover has appreciated differently than property in the suburbs or more rural areas. Yet the counties have locked in the relative valuations that existed in 1987, 1983, and 1974.

## C. Problems For Delaware's Public Schools

For Delaware's public schools, the failure to comply with the Market Value Requirement creates at least three problems.

First, the tax base generates less revenue than it otherwise would. In Fiscal Year 2016, the out-of-date assessments generated approximately $640 million in tax revenue.[7] At fair market value, the same rates would generate many times that figure. But even if the counties started complying with the Market Value Requirement tomorrow, tax payers need not fear that their tax bills would double or triple. The Delaware Code caps the maximum increase in tax burden from any assessment at 10%.[8] That said, a 10% bump is nothing to

---

[7] *See* Compl. ¶ 27.

[8] 14 *Del. C.* § 1916(b) ("Whenever the qualified voters of a reorganized school district have approved a specific rate of taxation or specified amount of taxation under § 1903 of this title and a subsequent general reassessment of all real estate in the county changes the total assessed valuation of the school district, the local board of education of each such local school district shall calculate a new real estate tax rate which, at its

scoff at. Many of us would appreciate a 10% raise. And here, the number is facially large—

$64 million. That amount could provide a lot of services for Disadvantaged Students.

Second, the current regime allocates money inequitably among districts based on relative values from three and four decades ago rather than relative values today. Each year, the Department of Education recommends that the General Assembly authorize an aggregate state-wide appropriation based on the number of "units of pupils" in each school district.[9] The General Assembly allocates appropriations in three buckets. Division I funds pay for administrators, teachers, and other personnel.[10] Division II funds primarily pay for textbooks, furniture, and other classroom equipment, but can be used for any lawful purpose.[11] Division III funds are budget equalization funds that are allocated based on a formula designed to provide matching funds to less wealthy districts.[12] The formula is complex but essentially pegs state funding to a combination of each school district's "effort index" and "ability index."[13] The effort index is the ratio by which the district's tax burden

---

maximum, would realize no more than 10% increase in actual revenue over the revenue derived by real estate tax levied in the fiscal year immediately preceding such reassessed real estate valuation. Any subsequent increase in rate of taxation shall be achieved only by an election of the qualified voters in such local school district according to the procedures in § 1903 of this title.").

[9] *See* 14 *Del. C.* §§ 1702(b), 1703–04.

[10] 14 *Del. C.* § 1702(c).

[11] 14 *Del. C.* §§ 1702(d), 1706.

[12] *See* 14 *Del. C.* § 1707.

[13] 14 *Del. C.* § 1707(b)(3) & (c).

exceeds the average tax burden across the state. The ability index is the district's aggregate property value. Because those property values remain tied to values from decades ago, they are no longer an accurate measure of the districts' relative ability. The equalization effort becomes arbitrary.

Third, the current regime forces school districts to ask voters on a regular basis to raise their own taxes. Because the counties are not complying with the Market Value Requirement, the value of a school district's tax base remains flat. But the cost of running a school district does not remain flat. Each year, inflation erodes the purchasing power of a school district's budget, requiring more dollars to achieve the same results. Even if a school district does not introduce any new initiatives and just maintains the status quo, the absence of regular and systematic assessments inevitably generates a funding gap.

The failure to adhere to the Market Value Requirement leaves school districts just with one option. The Delaware Code empowers the school board for each district to set the amount of tax per dollar of assessed value that a property owner must pay.[14] Using this authority, the school board can increase the tax rate so that the same assessed value generates more revenue. But the school board cannot levy the tax unilaterally. The school board first must "call a special election to be held at the polling place or places designated by the Department of Elections conducting the election."[15] The outcome of the special

[14] *See* 14 *Del. C.* § 1902.

[15] 14 *Del. C.* § 1903.

6

election determines whether the tax can be levied.[16] Generally speaking, in Delaware, a school district needs to prevail in a referendum every three to five years.[17]

Frequent tax referendums generate negative reactions. Some residents object as a matter of principle to having their taxes raised. More object if they think their tax dollars are not being used wisely. Delaware's complex system for funding public schools is not easily understood. Confronted with regular requests for tax increases, some residents naturally infer that school officials are wasting money. Community resentment does not help the public schools or Disadvantaged Students.

If counties adhered to the Market Value Requirement, then assessed values would increase with inflation. Indeed, property appreciation historically has outpaced broad measures of inflation. School district revenues would rise with property values, and the same tax rate would generate more money for the school district. Instead of having to seek voter approval to raise tax rates to cover the same expenses, and school districts could use referendums when they truly needed more money for new initiatives. Freed of the burden of conducting regular referendums, school personnel could devote more time to education. With district residents no longer being asked to raise their own taxes every three to five years, fewer residents would suspect that the districts were being fiscally irresponsible.

---

[16] 14 *Del. C.* § 1911 ("If the majority of the votes cast at the election . . . shall be for additional tax, the tax shall be levied and collected as provided in this chapter.").

[17] *See Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, App. A (Del. Ch. 2017) (compiling a likely underinclusive list of school referendums in Delaware, since 1980, drawn from publicly available articles in *The News Journal*).

**D.    The Roles of the County Officials**

In each county, officials generate a tax roll that identifies the assessed value of the property, then collect taxes based on the assessment value. The officials collect school taxes at the same time and in the same manner as county taxes.[18]

In New Castle County, the Office of Finance is responsible for preparing the annual tax rolls and collecting taxes, including for school districts in the county.[19] When the complaint was filed, Brian Maxwell, the County's Chief Financial Officer, managed the office. During the litigation, David M. Gregor took over as Chief Financial Officer.

In Kent County, the Department of Finance is responsible for preparing the annual tax rolls and collecting taxes.[20] Defendant Susan Durham, the County's Director of Finance, currently manages the department.

In Sussex County, the Department of Finance is responsible for preparing the annual tax rolls, although the school districts send out their own tax bills based on the County's tax roll.[21] Defendant Gina Jennings, the County's Director of Finance, currently manages the department.

---

[18] 14 *Del. C.* § 1917(a).

[19] 9 *Del. C.* §§ 1371(1) & (3), 1375.

[20] 9 *Del. C.* §§ 4123(b), 4124(c).

[21] 9 *Del. C.* §§ 7004(b) & (*l*), 7004(c)(2) & (j); *see* 14 *Del. C.* § 1902; Dkt. 16 at 1.

**E.      This Litigation**

On January 16, 2018, the plaintiffs filed this litigation. Both plaintiffs are institutions with a strong interest in Delaware's educational system and the challenges faced by Disadvantaged Students.

Delawareans for Educational Opportunity is a nonprofit association of Delawareans who are concerned about the state's failure to provide all children with an adequate education. They have joined together for the purpose of improving the Delaware education system so that all children have a meaningful opportunity to obtain an adequate education regardless of where they live, their economic circumstances, their health, their disability status, or their first language. The membership of Delawareans for Educational Opportunity includes the parents of Disadvantaged Children who are enrolled in the public schools.

The NAACP Delaware State Conference of Branches ("NAACP-DE") is a non-partisan organization affiliated with the National Association for the Advancement of Colored People. NAACP-DE has seven branches located throughout the state. NAACP-DE's mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. NAACP-DE is dedicated to ensuring that all students in Delaware have an equal opportunity to obtain a high quality public education. It has worked since 1915 to remove barriers to the participation of minority students on a fully equal basis, and to ensure that all students receive the services they need to succeed. The members of NAACP-DE and its branches include parents of Disadvantaged Children who are enrolled in the public schools.

The plaintiffs' complaint asserted three claims. In Counts I and II, the plaintiffs asserted that the State of Delaware is violating Section 1 of Article X of the Delaware State Constitution, which states that the "General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools[.]" In Count III, the plaintiffs asserted that the counties are violating the Market Value Requirement.

The plaintiffs' complaint named Maxwell, Durham, and Jennings as defendants in their official capacities. During the course of the case, Gregor replaced Maxwell as a defendant. To reiterate, no one has accused them personally of engaging in any wrongdoing. The plaintiffs' real beef is with the counties' decades-long policies of not assessing properties in accordance with the Market Value Requirement. Because the plaintiffs are really focused on the counties rather than the individuals, this decision does not refer to the officials by name. It refers to the "County Defendants" and speaks in terms of positions taken by the counties. For readers not steeped in Delaware county politics, this also makes it easier to keep track of the players, particularly with the switch between Maxwell and Gregory.

The plaintiffs' complaint also named as defendants Governor John Carney, Secretary of Education Susan Bunting, and State Treasurer Kenneth Simpler. Once again, the plaintiffs did not accuse them personally of any wrongdoing. They too were sued in their official capacities.

The complaint did not delineate which defendants were sued on which count. As I read the complaint, the state officials are the relevant defendants for Counts I and II. The county officials are the relevant defendants for Count III.

10

## II.    LEGAL ANALYSIS

This decision addresses Count III of the complaint. The County Defendants contend that Count III should be dismissed because this court lacks subject matter jurisdiction. They also argue in one form or another that their financial officers are not proper defendants. Only Kent County argues that the complaint does not state a claim on which relief can be granted. None of the arguments are persuasive.[22]

### A.    Rule 12(b)(1): Subject Matter Jurisdiction

The County Defendants have moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(1) for lack of subject matter jurisdiction. All argue that the plaintiffs have an adequate remedy at law in the form of a petition for writ of mandamus from the Delaware Superior Court. New Castle County and Sussex County argue that the plaintiffs also have an adequate remedy at law in the form of a declaratory judgment action in Delaware Superior Court. Sussex County goes further by arguing that the plaintiffs are seeking an improper advisory opinion.

"The Delaware Court of Chancery is a court of equity. It has only that limited jurisdiction that the Court of Chancery in England possessed at the time of the American

---

[22] As noted, the complaint did not spell out clearly which defendants were named in connection with each count, so Kent County and Sussex County addressed Counts I and II as well. Both counties invoked the separation of powers, and Sussex County mentioned exhaustion of administrative remedies. Because this decision only addresses Count III, it does not reach those arguments. Regardless, the County Defendants are not proper defendants for purposes of Counts I and II, so those issues are moot for purposes of the County Defendants.

Revolution, or such jurisdiction as has been conferred upon it by the Delaware General Assembly."[23] The Court of Chancery can exercise subject matter jurisdiction only when a case falls into one of three buckets.[24] First, jurisdiction exists if a plaintiff states an equitable claim.[25] Second, jurisdiction exists if a plaintiff requests equitable relief and there is no adequate remedy at law.[26] Third, jurisdiction exists by statute.[27] Additionally, the clean-up doctrine provides that if this court would have equitable jurisdiction over a part of a controversy, then it can address the remaining portions of the controversy as well.[28]

"Equitable jurisdiction must be determined from the face of the complaint as of the time of filing, with all material factual allegations viewed as true."[29] "In deciding whether or not equitable jurisdiction exists, the Court must . . . focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim."[30]

---

[23] *El Paso Natural Gas Co. v. TransAm. Natural Gas Corp.*, 669 A.2d 36, 39 (Del. 1995).

[24] *See generally Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004).

[25] *See* 10 *Del. C.* § 341.

[26] *See* 10 *Del. C.* §§ 341, 342.

[27] *See, e.g.*, 8 *Del. C.* § 111; 6 *Del. C.* §§ 17-111, 18-111.

[28] *See generally Getty Ref. & Mktg. Co. v. Park Oil, Inc.*, 385 A.2d 147, 149 (Del. Ch. 1978).

[29] *Int'l Bus. Mach. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991).

[30] *Candlewood*, 859 A.2d at 997.

"Chancery jurisdiction is not conferred by the incantation of magic words. . . . If a realistic evaluation leads to the conclusion that an adequate remedy is available this court . . . will not accept jurisdiction over the matter."[31] That said,

> the mere fact that a litigant may have a remedy at law does not divest Chancery of its jurisdiction. The basic jurisdictional fact upon which equity operates is the absence of an [a]dequate remedy in the law courts. The question is whether the remedy available at law will afford the plaintiff full, fair and complete relief.[32]

"A remedy at law must be as practical to the ends of justice and to its prompt administration as the remedy in equity."[33] "The Court of Chancery, therefore, may exercise jurisdiction over an action in which an injunction is sought to prevent a threatened injury where the remedy at law, if there should be one, would undoubtedly be less complete and less effective than in a court of equity."[34]

---

[31] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) (Allen, C); *accord Comdisco*, 602 A.2d at 78 ("[A] judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery."); *Cochran v. F.H. Smith Co.*, 174 A.119, 121 (Del. Ch. 1934) (Wolcott, C.) ("It appears sometimes to be thought that if fraud be present in any situation the *open sesame* has been found upon the pronouncing of which the doors of equity are flung wide apart. That is a misconception.").

[32] *Hughes Tool Co. v. Fawcett Publ'ns, Inc.*, 315 A.2d 577, 579 (Del. 1974) (internal quotation marks and citations omitted).

[33] *El Paso*, 669 A.2d at 39.

[34] *Id.* at 39–40 (internal quotation marks omitted).

13

### 1. Mandamus

The County Defendants uniformly interpreted the plaintiffs' complaint as asking for an order compelling the counties to conduct a general assessment. That was a clever move, because it enabled them to argue that this court lacks jurisdiction because the plaintiffs allegedly have an adequate remedy at law in the form of a petition for mandamus in the Delaware Superior Court.

"A writ of mandamus may be issued by the Superior Court to command a lower court, agency, or public official to perform a duty 'to which the petitioner has established a clear legal right.'"[35] "For the performance of a duty to be clearly owed to a petitioner, it must be nondiscretionary or ministerial, meaning that it is 'prescribed with such precision and certainty that nothing is left to discretion or judgment.'"[36]

A writ of mandamus would not be available in this case. As the County Defendants elsewhere recognize, the Delaware Code does not require that counties conduct general assessments on any regular schedule. If the Delaware Code required that a county conduct a general assessment every year, or on a specific schedule, then a petition for mandamus might be viable. But the General Assembly did not prescribe a specific schedule for conducting general assessments. It chose instead to leave the matter to the judgment of the

---

[35] *Brittingham v. Town of Georgetown*, 113 A.3d 519, 524 (Del. 2015) (quoting *Clough v. State*, 686 A.2d 158, 159 (Del. 1996)).

[36] *Id.* (quoting *Guy v. Greenhouse*, 687 A.2d 827, 1993 WL 557938, at *1 (Del. Dec. 30, 1993) (TABLE)).

leaders of each county with the expectation that they would take the steps necessary to comply with the Market Value Requirement. A writ of mandamus directing the counties to conduct general assessments could not issue.

Rather than seeking an order enforcing a nondiscretionary requirement, the plaintiffs have made a classic appeal to the powers of equity. They argue that so much time has passed since the last assessments that the current system no longer complies with the Market Value Requirement. Based on that situation, they seek equitable relief to remedy the statutory violation. It is conceivable in the abstract that one form of relief could be an order requiring a general assessment. Because the statute does not specifically command when general assessments are to take place, only this court could grant that relief.[37] If requested, however, that relief would need to be sought from defendants with the power to conduct a general assessment.[38]

In this case, however, the plaintiffs are not seeking an order compelling a general assessment. Notwithstanding the uniform interpretation adopted by the County Defendants, the complaint does not make that request. What the plaintiffs ask for is an equitable remedy that will restore compliance with the Market Value Requirement. What

---

[37] *See Webb v. Diamond State Tel. Co.*, 237 A.2d 143, 146 (Del. Ch. 1967) (holding that mandamus was "not an appropriate or adequate remedy" but that plaintiff could be entitled to an affirmative injunction "if the relevant facts are resolved in his favor").

[38] *See Young v. Red Clay Consol. Sch. Dist.*, 2015 WL 5853762, at *8–13 (Del. Ch. Oct. 2, 2015) (dismissing claim against Board of Elections that sought to compel board to exercise authority that it did not possess).

form that remedy takes will be determined after trial, based on the evidence, taking into account the equities, and after hearing from all parties. To state the obvious, the court will only reach that issue if the plaintiffs prevail.

The plaintiffs have argued that the most fitting remedy would be an injunction barring the County Defendants from collecting taxes until the counties have complied with the Market Value Requirement. Relief along these lines would take the form of a prohibitive injunction. A writ of mandamus cannot provide prohibitive relief.[39]

The argument that the plaintiffs should seek a writ of mandamus therefore does not deprive this court of jurisdiction. The plaintiffs could not obtain a writ of mandamus because of the lack of a non-discretionary statutory requirement, and the remedies that could be awarded if the plaintiffs prevail encompass prohibitive relief that a writ of mandamus cannot provide.

---

[39] *See State ex rel. Lyons v. McDowell*, 57 A.2d 94, 98 (Del. 1947) ("The petition [for writ of mandamus] seeks to restrain or prevent the respondents from doing something. Many authorities hold, and we agree with their position, that the remedy by mandamus should not be used to prevent the commission of an Act."); *Moore v. Stango*, 1992 WL 114062, at *4 (Del. Super. May 8, 1992) ("The writ [of mandamus] is not for restraining or preventing action."); *see also Lynch v. Tunnell*, 236 A.2d 369, 373 (Del. 1967) (rejecting contention that mandamus provided proper remedy where plaintiffs contended that government agency lacked authority to act as it was doing; holding that Court of Chancery had jurisdiction based on request for injunctive relief); *Williamson v. Taylor*, 1998 WL 1180042, at *2 (Del. Ch. June 17, 1998) (distinguishing writ of mandamus from injunction and holding that latter was proper remedy where plaintiffs sought to bar further contact between parties); *Scarborough v. Mayor & Council of Town of Cheswold*, 303 A.2d 701, 704 (Del. Ch. 1973) (finding that injunction rather than mandamus was appropriate remedy to address violation of zoning ordinance).

### 2. The Declaratory Judgment Act

As an alternative argument against jurisdiction, New Castle County and Sussex County cite the Declaratory Judgment Act. They argue that the plaintiffs should sue in Superior Court to obtain a declaratory judgment that the counties are violating the Market Value Requirement. New Castle County argues that a lawsuit in Superior Court would provide an adequate remedy, divesting this court of jurisdiction, because the counties would adhere to the result. Sussex County makes a slightly different argument. After observing correctly that the Declaratory Judgment Act does not provide an independent basis for jurisdiction in this court,[40] Sussex County concludes that this court lacks jurisdiction over a declaratory judgment action.

The County Defendants' position rests on another misinterpretation of the complaint. The plaintiffs are not seeking a declaratory judgment that would determine the meaning of the Market Value Requirement. The Delaware Supreme Court already provided that declaration over two decades ago when it interpreted the statutory requirement that property value be assessed at its "true value in money" and stated that this concept was "the same as its fair market value."[41]

Rather than seeking a declaratory judgment, the plaintiffs have asserted a statutory violation. They contend that the County Defendants have violated the Market Value

---

[40] *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 591 (Del. 1970).

[41] *Teachers Ins.*, 669 A.2d at 102.

17

Statute, as construed by the Delaware Supreme Court, by assessing taxes based on valuations from 1987, 1983, and 1974. They want a remedy for that ongoing violation. One available remedy for an ongoing violation is an injunction directing the violator to stop committing the violation.

Assuming for the sake of argument that I nevertheless viewed the Count III through the lens of the Declaratory Judgment Act, this court still would have jurisdiction. The Declaratory Judgment Act did not change this court's jurisdiction.

> Jurisdiction under the Declaratory Judgment Act is based on the question of whether law or equity traditionally would have jurisdiction of the subject matter if the controversy should develop to a later stage; of whether the issues raised would be presented in a legal or equitable action if coercive relief were being sought. Specifically, the Chancery Court has jurisdiction in a declaratory judgment action if there is any underlying basis for equity jurisdiction measured by traditional standards.[42]

In this case, equitable jurisdiction exists because of the need for equitable relief.

As noted, New Castle County argues that equitable relief is unnecessary because the court can presume that "the County will respect any decision rendered by any competent court of this State."[43] That is generally true, but in this situation the facts support a reasonable inference that the counties have been ignoring the Market Value Requirement for decades, even after the Delaware Supreme Court interpreted the statutory language. Coercive relief may well be necessary.

---

[42] *Diebold*, 267 A.2d at 591.

[43] *Christiana Town Ctr. LLC v. New Castle Cty.*, 2003 WL 21314499, at *4 (Del. Ch. June 6, 2003).

18

The role of equity is necessary for another reason as well. A declaratory judgment that required immediate compliance could create a proverbial train wreck. An equitable decree can be tailored to the facts of the case. It can thus take into account proposals that the counties may make to solve the statutory problem (assuming the plaintiffs prove their case) and the time frame for implementation. This court also can adapt its decree to accommodate changed conditions. [44] Through the exercise of its equitable jurisdiction, this court will be in a position to consider the facts and circumstances, balance the equities, and award carefully crafted relief.

### 3. The Advisory Opinion Argument

Sussex County adds a third argument against jurisdiction, claiming that the plaintiffs are seeking an advisory opinion on a hypothetical question. Although this argument seems primarily directed at Counts I and II, which are not at issue in this opinion, the county explicitly references Count III as well. As to Count III, the argument is not well taken.

The plaintiffs have alleged the existence of a concrete situation: the decades-long practice of assessing taxes based on property valuations from 1987, 1983, and 1974. Those facts are not hypothetical or fluid; they are established and fixed. The plaintiffs allege that these assessments violate the Market Value Requirement, which is a statutory requirement

---

[44] *See United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) (Cardozo, J.) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."); *see, e.g.*, *High River Ltd. P'ship v. Forest Labs., Inc.*, 2013 WL 492555, at *6–7 (Del. Ch. Feb. 5, 2013) (discussing the court's power to modify prospective final judgments under Court of Chancery Rule 60(b)(5)).

19

that has been interpreted by the Delaware Supreme Court. If they prove their case, the plaintiffs seek an equitable remedy.

By addressing this situation, the court would not be issuing an advisory opinion. Determining whether the counties are violating a clear statutory command to assess property based on its "true value in money" is no different than determining whether a driver has violated the speed limit. This is a core function of the judicial branch.

## B.     The County Officials As Appropriate Defendants

The County Defendants argue that their officials are not proper defendants to answer for Count III because, assuming the counties are violating the Market Value Requirement, the officials by themselves cannot do anything about it. As everyone agrees, the officials themselves lack the power to raise taxes unilaterally or to order a general assessment. This argument reprises the County Defendants' interpretation of the complaint as only seeking an order compelling the counties to conduct a general assessment. To reiterate, the plaintiffs have not pinned themselves to that remedy, and they have indicated that the primary remedy they will seek is a negative injunction to restrain the ability of the county officials to collect taxes.

The county officials are the correct defendants (in their official capacities) for purposes of this type of relief.[45] The plaintiffs seek to stop the county governments from

---

[45] *Cf. Edelman v. Jordan*, 415 U.S. 651, 664–65 (1974) (explaining that a plaintiff may pursue a lawsuit seeking prospective injunctive relief against a government official in their official capacity); *Ex parte Young*, 209 U.S. 123, 159–60 (1908) (recognizing lawsuit

collecting taxes in a manner that violates statutory law as interpreted by the Delaware Supreme Court. To achieve that end, the law permits a plaintiff to sue the officials responsible for carrying out that decision in their official capacity.[46] If the plaintiffs prevail, then the officials can be enjoined, stopping the statutory violation that the plaintiffs have challenged.

**C.      Rule 12(b)(6): Failure To State A Claim On Which Relief Can Be Granted**

According to Kent County, Count III fails to state a claim on which relief can be granted. When considering such a motion, the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiff.[47] When applying this standard, "dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[48]

---

seeking prospective injunctive relief against official acting under state statute as proper vehicle for challenging statue).

[46] *See, e.g.*, *Carper v. Stiftel*, 384 A.2d 2 (Del. 1977) (entertaining action for declaratory judgment and injunctive relief brought by members of the Superior Court against certain state officials sued in their official capacities).

[47] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[48] *Id.* (internal quotation marks omitted).

21

Kent County argues that it has no duty to assess property in accordance with the Market Value Requirement. That is a bold claim. Taken literally, it means that a century from now, Kent County could still be basing assessments on property values from 1983.

Kent County correctly observes that "there is no statute that specifies how frequently a general assessment of real property must be done."[49] Kent County also correctly observes that under prior versions of the Delaware Code, the statutory scheme did mandate periodic general assessments. Before 1869, general assessments were required every eight years. In 1869, the General Assembly changed the requirement and mandated general assessment every four years.[50] In 1898, the General Assembly passed legislation stating that "a general assessment of real property [in Kent County] shall stand and be acted upon for four years and shall be made so as to be returned on the said first Tuesday in February, A. D. 1899 and every fourth year thereafter."[51] In 1920, the General Assembly required Kent County to perform a general assessment "so as to be acted upon for the year 1921."[52] In 1933, the General Assembly required that Kent County conduct a general assessment "for the year 1934" and that "a like general assessment shall be made every

---

[49] Dkt. 14 at 5.

[50] 13 Del. Laws ch. 394, § 1 (1869).

[51] 21 Del. Laws ch. 29, § 1 (1898).

[52] 31 Del. Laws ch. 14, § 18 (1920).

22

four years thereafter."[53] In 1943, the General Assembly again addressed general assessments in Kent County by providing as follows:

> A general assessment of persons and real estate and houses and other buildings owned by tenants or occupiers on lands owned by others in Kent County shall be made by the Board of Assessment for the year 1934 and a like general assessment shall be made every four years thereafter. This General Assessment, when so made, shall stand and be acted on for four years, unless one of the annual assessments herein provided for shall add to said assessment or change or alter certain items of same, in which case the revision or alteration shall stand and be acted on in place of the item appearing on said General Assessment.[54]

That provision survived until 1959, when the General Assembly repealed it, leaving only the general requirement that property be assessed at its "true value in money."[55]

Kent County infers from this history that it no longer has any obligation to conduct general assessments. That conclusion does not follow. The statutory change instead eliminated any requirement that Kent County (or any of the counties) conduct assessments on a strict, prescribed schedule. The General Assembly retained the Market Value Requirement. The General Assembly thus entrusted local county officials with the discretion to determine how often it would be necessary to conduct a general assessment so as to comply with the Market Value Requirement. In my view, that makes a great deal of sense. Property values may change faster during some periods than at others. As with any bright-line rule, a strict temporal schedule might require either too many assessments

---

[53] 38 Del. Laws ch. 74, § 18 (1933).

[54] 44 Del. Laws ch. 91, § 45 (1943).

[55] 9 *Del. C.* § 8306(a).

or too few. The General Assembly understandably felt that county officials would be in a position to judge these matters, determine when property values should be updated, and take steps to ensure that the Market Value Requirement is met.

Without a schedule for mandated assessments, the Market Value Requirement becomes the polestar. The counties in Delaware can follow the practices and procedures that they believe are warranted, as long as they comply the Market Value Requirement.

In 1977, the Delaware Supreme Court recognized that at some point, assessed values could become so stale as to be statutorily infirm.[56] The plaintiffs contend that "an unreasonable period of time" has now passed since the last general assessments such that the current approach is statutorily infirm.[57] In 1992, the Delaware Court of Chancery declined to consider a similar claim that the assessed values in New Castle County had become stale, but they were then only nine years old.[58] The assessed values are now thirty-one, thirty-five, and forty-four years old.

It is reasonably conceivable that using assessments from 1987, 1983, and 1974 violates the Market Value Requirement. Determining whether or not that is true will require an evidentiary record that addresses changes in value since these years. It likely will require

---

[56] *See Bd. of Assessment Review for New Castle Cty. v. Stewart*, 378 A.2d 113, 116 (Del. 1977) (observing that no one had argued that "an unreasonable period of time has passed since the last general assessment was made in 1970").

[57] *See Stewart*, 378 A.2d at 116.

[58] *Cronin v. Greenhouse*, 1992 WL 403111, at *2 (Del. Ch. Dec. 26, 1992).

expert testimony to address not only aggregate levels of appreciation countywide, but also relative levels of appreciation between different school districts. For present purposes, the allegations of the complaint are sufficient to state a claim.

## D.       Standing

During oral argument, on reply, New Castle County argued for the first time that the plaintiffs lacked standing to pursue Count III. The parties did not brief this issue, and the court does not have an adequate basis to address it. Ordinarily, raising a new argument so tardily would result in waiver, but to the extent the argument would affect this court's subject matter jurisdiction, it would not be waivable. Should the County Defendants choose to renew their arguments on standing, they shall address the issue of waiver.

## III.       CONCLUSION

The General Assembly enacted the Market Value Requirement. Count III of the complaint states a claim that the counties are not complying with the law. This court possesses jurisdiction over that claim and, if it is proven, can provide an equitable remedy. The defendants' motions to dismiss Count III are denied.